Keith SCHLEGEL, Plaintiff,

v.

LIFE INS. CO. OF N. AMERICA, et al., Defendants.

No. CIV.A.02–7894.

United States District Court, E.D. Pennsylvania.

June 9, 2003.

Gavin P. Lentz, Bochetto & Lentz, PC, Vincent Vanlaar, Bochetto and Lentz, P.C., Philadelphia, PA, for Plaintiff.

Anita B. Weinstein, Cozen O'Connor, Elizabeth A. Venditta, White & Williams, LLP, Mark C. Stephenson, Cozen O'Connor, Philadelphia, PA, for Defendants.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

■ Keith Schlegel has sued the Life Insurance Company of North America (LINA) and Cigna Insurance Company (CIGNA) and the Cigna Group for the allegedly arbitrary and capricious denial of disability insurance benefits under an ERISA plan. Schlegel contends that he became "disabled," within the meaning set forth in his policy, due to a combination of debilitating epileptic seizures, depression, anxiety, memory loss and narcolepsy, that the defendants refused to investigate his claim, pay him benefits, or waive premiums, and that they ultimately unfairly terminated his policy. In the instant action, Schlegel seeks (1) recovery of benefits under ERISA, (2) punitive damages for bad faith insurance practices under Pennsylvania law, 42 Pa. Cons.Stat. Ann. § 8371, and (3) damages for breach of contract. Before the court is defendants' motion for summary judgment, and plaintiff's motion for partial summary judgment.[1]

■ For the reasons that follow, the court concludes that defendants' denial of benefits was neither arbitrary nor capricious under ERISA, and will grant summary judgment in favor of LINA and against plaintiff on this issue. In light of recent legal developments,[2] however, the

---

1. Federal Rule of Civil Procedure 56(c) is designed to secure a just, speedy and inexpensive determination of cases before they proceed to trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When confronted with cross-motions for summary judgment "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (1998). Thus, with respect to each party, summary judgment is proper when the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine only if the evidence is such that a reasonable jury could find for the non-moving party. *Id.* at 251–52, 106 S.Ct. 2505. In making this determination, a court must draw all reasonable inferences in favor of the non-movant. *See Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. denied*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984). Thus, summary judgment should be granted only if no reasonable trier of fact could find for the non-moving party. *See id.; Radich v. Goode*, 886 F.2d 1391, 1395 (3d Cir.1989).

2. Defendant filed its motion for summary judgment on March 26, 2003. On April 2, 2003, the Supreme Court handed down a decision in *Kentucky Ass'n of Health Plans, Inc. v. Miller*, —— U.S. ——, 123 S.Ct. 1471, 155 L.Ed.2d 468 (2003) which altered the applicable test used to determine whether state laws that are otherwise preempted by ERISA, fall within the statute's savings clause. Although the predicted impact of this decision on Pennsylvania's bad faith insurance statute was mentioned in passing at oral argument, *see* T.T. 4/25/03 at 54–55, the issue has not been fully briefed or argued by the parties, and is therefore not ready for disposition on summary judgment at this time.

court will deny without prejudice defendant's motion for summary judgment to the extent that it argues that ERISA preempts plaintiff's Pennsylvania law bad faith insurance claim in order to allow for briefing and argument on the issue. Finally, plaintiff's breach of contract claim will be denied with prejudice, the plaintiff having advised the court that he does not intend to proceed on this claim.[3]

## I. BACKGROUND

In January 2000, Keith Schlegel, then working as an Instructor at Drexel University, became insured under a Group Disability Policy purchased by his employer and issued by LINA. The LINA policy provided that a Drexel employee would be considered disabled, and thus eligible for disability benefits, if, "solely because of Injury or Sickness, he ... is either (1) unable to perform all the material duties of his ... Regular Occupation or Qualified Alternative; or (2) unable to earn 80% or more of his ... indexed Covered Earnings ...." Within the meaning of the policy, a "Sickness" is "[a]ny physical or mental illness," the insured's "Regular Occupation" is "[t]he occupation the Employee routinely performs at the time the Disability begins," and a "Qualified Alternative" is "[a]n occupation that meets all of the conditions that follow":

(1) the material duties of the occupation can be performed by the Employee based on his or her training, experience or education;

(2) it is within the same geographic area as the Regular Occupation the Employ-

ee holds with the Employer on the date the Employee's Disability begins;

(3) a job in that occupation is offered to the Employee by the Employer; and

(4) the wages for that occupation including commissions and bonus are 80% or more of the Employee's Indexed Covered Earnings.

The policy then sets forth a detailed process by which an insured may apply for disability benefits.

The policy emphasizes that, before an applicant may qualify for benefits, "[h]e ... must provide ... at his ... own expense, satisfactory proof of disability before benefits will be paid ... The Insurance Company will require proof of the Employee's Disability for benefits to continue." It further states that LINA will evaluate an employee's ability to work through (1) medical evidence that the employee submits, (2) consultation with the employee's physician, (3) "evaluation of the [e]mployee's ability to work by not more than three independent experts if required by the Insurance Company," and (4) a determination of whether an employer has offered the insured a job that meets his capacity to perform work.

Schlegel, a longtime sufferer of depression, panic, anxiety, seizure and sleep disorders, applied for disability benefits under the LINA policy on March 27, 2001. His application was denied, and two appeals followed. LINA denied Schlegel's final appeal on June 3, 2002, and Schlegel then filed the instant suit in federal court.

---

**3.** While plaintiff indicated to the court that he "voluntarily withdraws his claim for breach of contract without prejudice," Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. at 15 n. 8, he may not do so, unless either the defendant agrees, see Fed.R.Civ.P. 41(a)(1), which is not of record here, or the court approves it upon such "terms and conditions

as the court deems proper." Fed.R.Civ.P. 41(a)(2). The court concludes that at this stage of the litigation, after the completion of discovery and the filing of summary judgment actions, only a withdrawal *with* prejudice of a cause of action based upon the same facts as those alleged in the other counts is proper.

## II. DISCUSSION

### A. *Standard of Review*

 Where an ERISA plan gives the plan administrator discretionary authority to interpret the terms of the plan, judicial review of a denial of benefits is limited to determining whether the administrator abused his or her discretion. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In making this determination, the court must apply an arbitrary and capricious standard. *See Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40, 44–45 (3d Cir.1993). Under the arbitrary and capricious standard, a court "is not free to substitute its own judgment for that of the [administrator] in determining eligibility for plan benefits." *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 439 (3d Cir.1997) (quotation omitted). Rather, the court must defer to the administrator of an employee benefit plan unless the administrator's decision is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Abnathya,* 2 F.3d at 45 (quotation omitted).

According to LINA, as it is undisputed that the policy at issue endows the plan administrator discretion in determining benefit eligibility, the arbitrary and capricious standard is the appropriate standard to guide the court's review in this case. Schlegel, on the other hand, contends that LINA, in its dual role as plan administrator and payor of any benefits awarded, labors under a conflict of interest, such that a heightened standard of review is warranted. For the reasons that follow, the court does not agree.

 Where there is an inherent conflict of interest because an insurance company both determines eligibility for benefits and pays for those benefits out of its own funds, a heightened standard of review is required. *See Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377, 390 (3d Cir.2000). To this end, the Third Circuit has directed courts to apply a "sliding scale approach, according to different degrees of deference [to the plan administrator's decision] depending on the apparent seriousness of the conflict." *Id.* at 392. In other words, "the greater the evidence of conflict on the part of the administrator, the less deferential ... the abuse of discretion standard" applied to the particular case. *Id.* at 393 (quotation omitted).

 In doing so, the court may "take into account the sophistication of the parties, the information accessible to the parties, and the exact financial arrangement between the insurer and the company." *Pinto,* 214 F.3d at 392 ("For example, a court can consider whether the insurance contract is fixed for a term of years or changes annually, and whether the fee paid by the company is modified if there are especially large outlays of capital by the insurer."). "Another factor to be considered is the current status of the fiduciary." *Id.* ("When companies are breaking up, or laying off a significant percentage of their employees, or moving all their operations, [the presumed desire to maintain employee satisfaction] incentives diminish significantly.").

 The burden of proof is on the claimant to show that a heightened standard of review is warranted in a particular case. *See Kotrosits v. GATX Corp. Non–Contributory Pension Plan for Salaried Employees,* 970 F.2d 1165, 1174 (3d Cir. 1992) ("Where the sponsor of a Plan reserves for the Plan administrators the discretion to interpret the Plan, anyone urging that a court disregard that reservation has the burden of showing some reason to believe the exercise of discretion has been tainted."). If the claimant proves that a heightened degree of scrutiny applies, the claimant must still meet the ultimate bur-

den of proving eligibility for disability benefits. *Pinto,* 214 F.3d at 392.

■ In this case, Schlegel has failed to meet his burden of proving that the court should apply a heightened arbitrary and capricious standard when evaluating LINA's denial of his claim. Schlegel asserts only that LINA both insures and administers the ERISA plan at issue.[4] Presented with no other information bearing on the *Pinto* inquiry, the court cannot conclude that a heightened arbitrary and capricious standard is warranted in this case. Therefore, the court will evaluate LINA's decision under the unadulterated, deferential arbitrary and capricious standard of review.

**B.** *Evidence Submitted by Schlegel after the Third Denial of Benefits Is Not a Part of the Record and May Not Now Be Considered by the Court.*

■ "Under the arbitrary and capricious standard of review, the 'whole' record consists of that evidence that was before the administrator when he made the decision being reviewed." *Mitchell* 113 F.3d at 440; *see also O'Sullivan v. Metropolitan Life Ins. Co.,* 114 F.Supp.2d 303, 309 (D.N.J.2000) (finding "no applicable authority that would support looking beyond the administrative record when deferentially reviewing a plan administrator's factual determination that a claimant is ineligible for benefits."). As the Tenth Circuit aptly explained:

> If a plan participant fails to bring evidence to the attention of the administrator, the participant cannot complain of

the administrator's failure to consider this evidence. [A plaintiff] is not entitled to a second chance to prove his disability. The district court's responsibility lay in determining whether the administrator's actions were arbitrary and capricious, *not* in determining whether [the plaintiff] was, in the district court's view, entitled to disability benefits. In effect, a curtain falls when the fiduciary completes its review, and for purposes of determining if substantial evidence supported the decision, the district court must evaluate the record as it was at the time of the decision.

*Roach v. Prudential Ins. Brokerage, Inc.,* 62 Fed.Appx. 294, 297–98 (10th Cir.2003) (slip opinion) (quoting *Sandoval v. Aetna Life & Cas. Ins. Co.,* 967 F.2d 377, 381 (10th Cir.1992)). An exception to this general rule is "appropriate where the evidence outside the administrative record is related to interpreting the plan or explaining medical terms and procedures relating to the claim." *O'Sullivan,* 114 F.Supp.2d at 310.

■ Schlegel has presented for the court's consideration a neuropsychological evaluation of Schlegel conducted by Dr. Brenda Ivker, a psychologist, and an employability evaluation conducted by vocational expert William O'Toole, both of which purport to provide the type of objective evidence that LINA at each denial asserted was missing from Schlegel's file. Schlegel asserts that the court may properly consider Dr. Ivker's report because it was submitted to LINA before the instant suit was filed, and O'Toole's report because it shows "how easy it was [for

---

4. Although it is not the defendant's burden to prove that a heightened standard should not apply, LINA addresses each of the *Pinto* factors. In particular, LINA asserts that (1) Schlegel was relatively sophisticated, as a professor with advanced degrees, and was assisted by counsel in preparing his claim for

disability benefits, (2) the administrative record was well developed, so that information was accessible to the parties, (3) that the employer and insurer had a financial relationship does not, without more, establish impermissible conflict, and (4) LINA is financially stable.

LINA] to get a vocational expert and to look at what they had." T.T. 4/25/03 at 11. The court does not agree.

It is undisputed that the two reports in question were submitted long after the administrative appeals process had ended in this case. Dr. Ivker's report was generated on September 17, 2002, and O'Toole's report [5] was sent to LINA on March 31, 2003. LINA's final denial of disability benefits was issued on June 3, 2002. Because neither report was before the administrator at the time that LINA decided to deny Schlegel benefits, nor do the reports fall within the exception that permits supplementation of the administrative record to interpret the plan or explain medical terms or procedures, the teachings of *Mitchell* bar the court from considering them at this late date.

### C. *LINA's Denial of Benefits Was Not Arbitrary and Capricious*

LINA argues that its decision to deny Schlegel benefits was neither arbitrary nor capricious, in essence because the record, developed through multiple rounds of review, was devoid of substantial evidence to support an award of disability benefits under the policy. Schlegel, on the other hand, argues that LINA's decision to deny him benefits was arbitrary and capricious under the authority of *Holzschuh v. UNUM Life Ins. Co. of America*, No. CIV.

A. 02–1035, 2002 WL 1609983 (E.D.Pa. Jul.18, 2002) (Newcomer, J.), because LINA allegedly failed to confront squarely the medical evidence that Schlegel submitted in support of his claim for benefits, arbitrarily rejected a report from Schlegel's treating physician in favor of medical reports from non-treating nurses and physicians, selectively relied on parts of plaintiff's medical records, and "acted more like an adversary, rather than an impartial judge of plaintiff's claim for benefits." Pl.'s Opp. to Def.'s Mot. for Summ. J. at 13. Upon examination of the record,[6] the court agrees with LINA's position and will grant summary judgment against Schlegel.

Schlegel first applied for disability benefits on or around March 27, 2001, when Dr. Edward W. Cipolla, his treating physician, filled out a disability certification for Schlegel pursuant to the Family and Medical Leave Act of 1990. Dr. Cipolla diagnosed Schlegel with chronic major depressive disorder with generalized and recurrent anxiety, and panic disorder, and wrote that Schlegel's "chronic major depressive disorder has exacerbated causing him to be incapacitated." Dr. Cipolla noted that he had been treating Schlegel for some years, that Schlegel's "condition is permanent and needs treatment with medicines," and that for an indeterminate period of time, Schlegel would have to take work intermittently or work on a less

---

**5.** *Thomas v. Continental Cas. Co.,* 7 F.Supp.2d 1048 (C.D.Cal.1998), which plaintiff cites for the proposition that "the law is well settled that Dr. O'Toole's vocational report can and should be considered," is actually inapposite. The court was permitted to examine evidence outside the record because it had concluded that the applicable standard of review was de novo, because the administrator had not exercised any discretionary authority in denying the plaintiff benefits. *Id.* at 1055. Indeed, the *Thomas* court noted that "[i]n most abuse of discretion cases, evidence outside the administrative record is *completely inadmissible.* However, the rule in de novo cases is not so

absolute." *Id.* (emphasis supplied). Schlegel has advanced no argument in favor of de novo review, nor does such a standard apply in this case.

**6.** The complete administrative record in this case, Schlegel's claim file, was submitted as an appendix to the defendants' motion for summary judgment. The defendant having failed to paginate the claim file, the court cannot provide specific page references to the record for purposes of this decision. The court suggests that documents of the length of Schlegel's claim file be paginated in order to facilitate meaningful discussion of the record.

than full schedule. However, a neurologic evaluation conducted on March 29, 2001 by a doctor at the Robert Wood Medical School, to whom Schlegel had been referred by Dr. Cipolla, found that at that time Schlegel had normal orientation, memory, attention, language, and knowledge. Similarly, an April 24, 2001 electroencephalogram posted normal results.

An April 2, 2001 CIGNA Group Insurance intake form for long term disability indicates that Schlegel's first day off from his work as an Instructor at Drexel was April 2, 2001. That form describes Schlegel's condition as "biochemically induced major depression disorder including anxiety and sleep disorder," and states that Schlegel was then receiving or had scheduled treatment from Dr. Cipolla. At the time of his first day off, Schlegel was making $3,569.42 per month, and had been working as an Instructor at Drexel since October 1, 1999. According to Schlegel's supervisor, describing Schlegel's occupational duties in a form submitted to CIGNA, "college instruction is intense-not sure if it's a stress."

On April 17, 2001, Schlegel filled out another CIGNA Disability Questionnaire in which he indicated that he suffered from "a biochemically (genetic) induced major depressive disorder chronic including panic disorder, anxiety disorder & sleep disorder, with seizure disorder as well. Memory, speech balance or coordination effected (sic)" for which he was seeing Dr. Cipolla once a month and taking several medications daily. Schlegel also indicated that he was applying for Social Security Benefits and did not anticipate returning to his previous job or another occupation in the near future because "[t]he outcome of [his] condition [was] very uncertain."

On May 2, 2001, Dr. Cippola filled out, as required by CIGNA, an Attending Physician's Statement of Disability, in which he again diagnosed Schlegel with chronic major depression with generalized anxiety and panic disorder, the symptoms of which included recurrent episodes of depression, anxiety and panic attacks. Dr. Cipolla noted that Schlegel's symptoms were work-related and that Schlegel experienced a worsening of symptoms due to stress. Dr. Cipolla was seeing Schlegel every two months, and had prescribed several medications. Dr. Cipolla wrote "N/A" on the portions of the form for physical limitations, mental impairment, extent of disability and rehabilitation.

On May 17, 2001, Maureen McCue of LINA interviewed Schlegel by telephone. During that interview, Schlegel reported the same diagnoses evident throughout the record. As of that time, Schlegel was seeing Dr. Cipolla once per month and Dr. Melissa Carran, a neurologist and epileptologist, every six weeks. He had also gotten a third opinion on his condition from a Dr. Brian Litt. McCue observed in her notes that Schlegel was not treating with a therapist, psychologist or psychiatrist because "Dr. Cipolla feels it is not necessary to see any therapist [at] this time."

On June 15, 2001, the defendants first denied Schlegel benefits. Based on the record before her at that time, case manager Christine Engongoro concluded that Schlegel retained the physical and mental capacity to perform the material duties of his regular occupation as an Instructor. Acknowledging Schlegel's longstanding physical and psychological disorders, with which he had worked for many years, Engongoro noted that the record before her was devoid of "specific functional impairments ... demonstrated as severe enough to preclude functionality," and lacked "clinical diagnostic evidence such as MSE testing and/or psychometric testing and/or neurocognitive test results that would conclusively preclude [Schlegel] from sustain-

ing the material duties requires of an Instructor."

Following this denial, Schlegel submitted copious medical information, not all of it relevant in time or subject matter to the chronic depression, anxiety, seizure and panic disorder that formed the basis of his 2001 claim for disability benefits.[7]

Among the new submissions were the results of a consultation with Dr. Richard Schwab of the University of Pennsylvania Medical Center, Penn Center for Sleep Disorders, who evaluated Schlegel in connection with Schlegel's complaints of significant daytime sleepiness, which caused him to fall asleep in permissive situations. A sleep study that Schlegel underwent on December 21, 1999, failed to pinpoint the cause of his problem, but Dr. Schwab found that his "sleep architecture was notable for the lack of delta and REM sleep [and he] also had evidence for alpha intrusion." On April 18, 2000, Dr. Schwab noting Schlegel's continued complaints, wrote:

> I think his daytime sleepiness could be due to four different factors: (1) underlying narcolepsy or central nervous system hypersomnolence, (2) depression, (3) relative sleep deprivation, and (4) a potential medication effect. Two out of these four are relatively easy to determine. I told him he should try to increase his sleep time from seven hours to eight or nine hours ... In addition, we will repeat the sleep study ... to rule out underlying narcolepsy.

Dr. Schwab recommended referring Schlegel to Dr. Marty Szuba of the University of Pennsylvania Department of Psychiatry for evaluation of his depression and sleepwalking, of which he had a history. The record reveals that Schlegel never undertook the second sleep study that Dr. Schwab had recommended.

Schlegel also included in his second set of submissions a May 2, 2001 report prepared by Dr. Brian Litt of the University of Pennsylvania Medical Center, Penn Epilepsy Center, who evaluated Schlegel at Dr. Cipolla's request for a second opinion regarding Schlegel's eligibility for a vagus nerve stimulator (VNS) implant[8] to his epilepsy and depression. Having examined Schlegel, Dr. Litt wrote, "Mr. Schlegel has a long history of anxiety with panic disorder and depression ... Because his seizures have proven to be nonepileptic, we recommended strongly against VNS implant. We suggested treatment with psychiatry in order to improve his depressive symptoms if he considers this necessary in the future."

Around June 25, 2001, Dr. Cipolla filled out a Multiple Impairments Questionnaire and Narrative Report for Schlegel in connection with Schlegel's application for Social Security benefits. In the Multiple Impairment Questionnaire, Dr. Cipolla reiterated Schlegel's diagnosis, and indicated that Schlegel's prognosis "depends on response to Effexor, Klonopin, and avoidance of stress factors." He noted that "with recent work situation [Schlegel] has been more depressed and anxious, despite present medications." Dr. Cipolla marked "N/A" with respect to the questionnaire's inquiries regarding pain and physical limitations, but noted that Schlegel's symp-

---

7. The augmented record contained, for example, Schlegel's treatment in 1995 and 1996, an account of his bout with hemorrhoids in 1997, and a 1999 recommendation of surgery for a torn meniscus.

8. A vagus nerve stimulator is an experimental treatment for epilepsy and depression. Once implanted in a patient, the VNS device stimulates the vagus nerve in the neck, and thus sends mild electrical impulses to those parts of the brain that regulate mood. A doctor may adjust the frequency and intensity of the impulses during a patient's followup office visits.

toms would likely increase if he were placed in a competitive work environment. He also indicated that Schlegel suffered from psychological limitations and was incapable of working even a low stress job.

Dr. Melissa A. Carran, an Assistant Professor of Neurology at the Cooper Hospital/University Medical Center, who had been following Schlegel's case since March 29, 2001 summarized the results of her neurologic consultation for Dr. Cippolla on June 4, 2001. Dr. Carran wrote that she was concerned that Schlegel was "having more seizures than he realizes, particularly at night since he complains of insomnia and is frequently very tired." Dr. Carran also "wonder[ed] if the panic attacks and depression he has are potentially ictal phenomenon in part ... I feel he needs better evaluation to rule out continued seizures. Therefore, I would like to admit him for video EEG monitoring." Subsequent to this letter, Dr. Cipolla's notes indicate that Schlegel underwent an EEG, which revealed "abnormal brain waves for the first time." Dr. Carran then sent a letter, apparently to defendants in connection with Schlegel's application for disability benefits, in which she described Schlegel as "a patient of mine with epilepsy." She indicated that Schlegel "suffers from sudden loss of consciousness and behavioral spells which make it impossible to work. Furthermore, he has suffered from memory impairment from years of epilepsy and medication, which make[ ] it impossible for him to work as a professor."

On December 3, 2001, Dr. Arnold Kaminer reviewed the file that Schlegel had submitted to the insurer, and concluded that the Insurance Company had not been provided with enough objective medical evidence to support the conclusion that Schlegel had diminished functional capacity. The noted deficits in the record included the absence of (1) the EEG with the reportedly abnormal brain waves, (2) "any records indicating a change in the claimant's reported or observed seizure disorder," (3) "any work up indicating that the claimant has memory impairment," (4) any psychiatric evaluation, as recommended by Dr. Litt, (5) any followup on Dr. Schwab's April 14, 2000 recommendation that an additional sleep study was necessary to pinpoint the cause of Schlegel's daytime sleepiness, (6) any reports of observed episodes of seizure in the past few years or any medical records indicating loss of consciousness or "behavioral spells" that would prevent Schlegel from working, and (7) records of Schlegel's hospitalization with respect to the VNS stimulator implantation, which, defendants were "told," had occurred on November 12, 2001.

Per Dr. Kaminer's recommendation, the defendants presented Schlegel's file to Dr. Benincasa, a psychiatrist, who reviewed Schlegel's file and voiced similar concerns about the incompleteness of the record with which he was presented. Dr. Benincasa stated that "[f]rom a psychiatric perspective Major Depression is noted and ... may be the primary condition, but there are no supporting documents to validate the condition, level or severity, [or] treatment ...." Moreover, Dr. Benincasa stated that, absent "documentation of the medical [symptoms] related to memory impairments, seizures and sleep [he could not] substantiate or rule out these conditions," or, indeed, other conditions of which seizures are a symptom.

Based on the foregoing evidence, case manager Barbara Aloni, detailing extensively the contents of Schlegel's file, reaffirmed CIGNA's decision to deny Schlegel benefits. The primary stated reason for the denial was that "the medical evidence ... failed to support impairments which would preclude [Schlegel's] ability to perform his occupation as an Instructor." In

light of this disposition, Schlegel appealed a third time.

Schlegel's record as of the time of his second appeal contained significant additional documentation relating to his treatment by Dr. Carran. The record included the October 1, 2001 report issued by Dr. Carran with regard to "abnormal brainwaves." Evaluating the EEG, Dr. Carran wrote, "[n]o seizures are recorded, there is a normal waking background. There are occasional bursts of left temporal delta; these are suspicious for epileptic form activity. The inpatient monitoring session is negative for pseudoseizure, taking together the results of the left temporal delta and negative seizure provocation." Dr. Carran enclosed no medical records concerning Schlegel's VNS implant, but wrote that with respect to epilepsy, "Mr. Schlegel [was] doing quite well on the current combination of [the medicine] Keppra and [VNS]. There have been no interval seizures, and I am heartened by this." With respect to Schlegel's anxiety and depression, however, Dr. Carran wrote, "This seems to be situational, as well as ongoing, long standing. [Schlegel] will continue to see Dr. Cipolla for this."

On February 13, 2002, Dr. Carran wrote to defendants regarding their second decision denying Schlegel benefits. In this letter, Dr. Carran stated that "[t]here has been a great deal of misunderstanding regarding Mr. Schlegel's management . . . ." Dr. Carran wrote:

> Mr. Schlegel saw me in the office on 3/29/01. At this time he described spells of deja vu and loss of consciousness which are consistent with partial seizures. He came to the office asking for management of these and was most in favor of [VNS] therapy. Since his only seizure medication at this juncture was Klonopin, I told him he was not a[VNS] candidate and started him on Lamictal. Since he was still very interested in the [VNS], he went for a second opinion to Dr. Brian Litt. Somehow Dr. Litt and his fellow, Dr. Mateo, did not realize that there were ongoing complex partial seizures, and it is possible that Mr. Schlegel did not make this clear since he has such an extensive problem with mood and anxiety. The essence of their evaluation was that they agreed he did not need a[VNS] at that juncture. Subsequently, Mr. Schlegel continued to have spells of confusion and staring that were refractory to medication. I started him on Keppra and this caused some relief, however, he was continuing to have spells that I thought could be epileptic. At this point, I admitted him for confirmation of this to the Princeton Medical Center to see whether there was any epileptic abnormality, and there was abnormality in the left temporal region, which was consistent with partial seizure. Although he did not have a seizure during the recording, there is interictal evidence that there are seizures. With this confirmation, I considered him a candidate for [VNS] therapy, and this was done, as you know.

Dr. Carran then indicated that she was still programming the VNS, and that Schlegel "continues to have problems with spells of lightheadedness and possible partial seizures as well as problems with his memory and cognition. We are in the process of treatment, however, he is very clearly not able to work and function in the classroom setting. Furthermore, he is not safe to do so . . . ." Dr. Carran then emphasized that she believed "that there has been a great deal of miscommunication and misunderstanding surrounding his case, and this is very unfortunate since [Schlegel] has lost a great deal of function and suffers from a chronic and debilitating illness."

On April 8, 2002 Dr. Cipolla submitted psychiatric information for disability to

CIGNA. He indicated that his clinical diagnoses were chronic major depressive disorder, seizure disorder, panic disorder, sleep disturbance, temporal lobe epilepsy and memory deficit, that he would not recommend any work for Schlegel at present, and that Schlegel's estimated return to work date was "indeterminate."

On April 19, 2002 Dr. Carran completed a Physical Ability Assessment for CIGNA. She indicated that Schlegel was barred from climbing or using ladders, and was never to work in extremes of heat or cold, vibration, and could never work extended shifts or overtime. Moreover, Schlegel could only occasionally work in wet and humid conditions, or where exposed to odors, fumes and particles, and use his lower extremities for foot controls.

On May 16, 2002, Dr. Patricia Loudis reviewed Schlegel's file for CIGNA and interviewed Dr. Carran as to her findings. Like Dr. Kaminer and Dr. Benincasa, Dr. Loudis also complained about the lack of objective medical documentation in the file. In particular, the file still lacked any (1) "actual documentation in the chart of a witnessed event or definite seizure/spells during recent inpatient monitoring," (2) "third party documentation of claimant's spells," (3) "report of neuropsychological tests," (4) psychiatric followup, in light of Dr. Cipolla's assessment that Schlegel's psychiatric condition necessitated leave from work, or (5) proof of a worsening or deterioration of Schlegel's condition. Dr. Loudis also emphasized that this lack of medical documentation undercut Dr. Carran's strongly worded letter of February 13, 2002. Having followed up the letter through a telephone interview, Dr. Loudis explained:

> Dr. Carran feels strongly that claimant has partial complex seizures, but in fact, objective documentation of occurrence of seizures has not been done. Complaints of dizziness/spells may have a non-sei-

zure origin, especially in a claimant with a history of panic attacks. The admission of 10/01 EEG videomonitoring would have been an excellent opportunity to supply information as to claimant's level of activity & behavior or complaints of any spells.

Based on the foregoing, Dr. Loudis concluded that there was "no documentation of a medical condition that would preclude claimant from working a full-time light duty position." As such, "[w]hether [Schlegel] has a psychiatric disability that precludes him from working a full-time light duty position [was] beyond the scope of [Dr. Loudis'] review."

On June 3, 2002, Brenda Bartlett of CIGNA wrote to Schlegel and conveyed the company's third denial of benefits. Bartlett indicated that the decision was reached upon review of Schlegel's entire claim file, in addition to (1) Dr. Carran's letter of February 13, 2002, (2) the October 1, 2001 video EEG monitoring results, (3) the physical abilities assessment form that Dr. Carran completed on April 19, 2002, (4) office notes from Dr. Carran, (5) a November 16, 2001 letter from Dr. Carran, (6) Dr. Carran's June 4, 2001 letter, and (7) the independent peer review conducted by Dr. Loudis. The letter states, in relevant part, as follows:

> The video EEG Monitoring recorded no seizure activity. There were occasional bursts of left temporal delta, suspicious for epileptic form activity. The report states testing was negative for pseudoseizure and negative for seizure provocation.
>
> The letter of June 4, 2001 from Dr. Carran to Dr. Cipolla states Mr. Schlegel has a history of likely complex partial seizures since 1983. Mr. Schlegel states his last seizure was 3–5 years ago. She was concerned that Mr. Schlegel may be having seizures at night, because

he claims of insomnia and is frequently very tired.

Dr. Carran's letter of November 16, 2001 ... states Mr. Schlegel suffers from memory impairment from "years for epilepsy and medication." However, the records reflect Mr. [Schlegel's] last seizure was 3–5 years ago, and that anti-seizure medication was discontinued in 1996 ... Dr. Carran completed a physical ability assessment form on April 19, 2003, indicating Mr. Schlegel is limited to basically sedentary work, with no exposure to heights, extreme heat, extreme cold, vibration or extended shifts and overtime. Mr. Schlegel's occupation as an Instructor does not require exposure to heights or elements.

The medical in Mr. Schlegel's file does not reflect he is under psychiatric care for depression, although his primary care provider prescribes anti-depressant medications which, as noted above, Mr. Schlegel has been taking for several years.

A peer review was undertaken with a neurologist who reviewed all of the medical records in Mr. Schlegel's file. The peer reviewer found that there is no actual documentation in the medical of the definite occurrence of seizures recorded. There is insufficient documentation to support the severity of a condition which would preclude Mr. Schlegel from performing his occupation as an Instructor.

Based on the foregoing, the defendants affirmed the previous denial of benefits. With this third denial, LINA advised Schlegel that he had exhausted all administrative remedies and had no further rights of appeal.

The court finds that, as explained by Bartlett in her denial of Schlegel's final appeal, the foregoing record is devoid of substantial evidence supporting a finding that Schlegel suffered from medical conditions of a severity that would prevent him from performing his job as an Instructor at the college level. It is true that Schlegel and his treating physicians have consistently repeated that he has a history and diagnosis of depression, as well as anxiety, panic, seizure and sleep disorders. It is also true that his treating physicians, Dr. Cipolla and Dr. Carran, on several occasions have stated their opinions that Schlegel is disabled as a result of these conclusions. However, the policy at issue required that Schlegel "provide ... at his ... own expense, satisfactory proof of disability before benefits will be paid," and it is on this prong of the inquiry that Schlegel's claim fails.[9]

9. Given that the LINA policy, by its terms, places the burden of proving disability squarely on the claimant, Schlegel's primary argument in support of his motion for partial summary judgment, is misplaced. Schlegel asserts that he is entitled to past and future benefits under the LINA policy because he because "there is no evidence demonstrating that ... Schlegel is able to perform the duties of his or any other occupation or earn 80% of his 'indexed covered earnings,'" i.e., to contradict the conclusions of his physicians that he was disabled or incapacitated as a result of his ailments. Pl.'s Mot. for Partial Summ. J. as to Count I and III at 2. The policy language quoted above makes clear that the burden rests on the claimant to prove that he is disabled, rather than on the insurer to prove the negative. Moreover, the language does not support a reading that would entitle a claimant to receive disability benefits simply upon providing some proof of disability, even if that proof was somehow suspect or conclusory. Rather, the claimant himself bears the burden of producing evidence of a caliber that will be "satisfactory" to persuade the insurer that he is, in fact, disabled and entitled to benefits. The question is therefore, whether the quality of the evidence that Schlegel produced was sufficient to constitute proof of disability.

The four independent medical consultants who evaluated the records all emphasized the lack of objective medical documentation supporting the findings of Dr. Cipolla and Dr. Carran. The consultants identified specific additional information that was lacking from a medical point of view, namely (1) records indicating a worsening in the claimant's reported or observed seizure disorder, (2) clinical testing reflecting Schlegel's claimed memory impairment, (3) psychiatric evaluations, (4) additional sleep studies, (5) recent observed episodes of seizure, either by third parties or during inpatient monitoring, (6) medical records indicating loss of consciousness or behavioral spells, (7) records of Schlegel's hospitalization for VNS implantation, or (8) results of neuropsychological testing. The need for additional evidence of this kind was also emphasized by some of Schlegel's own doctors. Dr. Richard Schwab suggested additional sleep studies, and Dr. Brian Litt, expressing doubts that Schlegel's seizures were caused by epilepsy, recommended psychiatric followup. In neither case were these recommendations acted upon, and these types of proof are therefore conspicuously absent from the record.

An examination of the record also reveals that Schlegel was given specific explanations of the deficiencies in the record, and, thus, an opportunity to correct them on appeal. At the time of Schlegel's first denial, Case Manager Engongoro indicated that the disability claim lacked documentation through "clinical diagnostic evidence such as MSE testing and/or psychometric testing and/or neurocognitive test results that would conclusively preclude Schlegel from sustaining the material duties required of an Instructor." At the time of the second denial, Case Manager Barbara Aloni indicated similar deficits in the medical evidence. Schlegel, however, did not attempt to remedy any of these deficits until after LINA had issued a final denial of these claims and the record had been closed.

Moreover, the objective evidence that the record does contain tends to undercut the findings of Dr. Cipolla and Dr. Carran. For example, within a month after Dr. Cipolla filled out Schlegel's first certification of disability and indicated that Schlegel suffered from chronic depression, anxiety and panic attacks, and that Schlegel's chronic depression had incapacitated him, a neurologic examination revealed that Schlegel was functioning normally and an electroencephalogram uncovered no abnormal brain activity. Days after these examinations, Dr. Cipolla then indicated "N/A" on a CIGNA form by the questions regarding the extent of Schlegel's physical limitations, mental impairment, disability and rehabilitation. Similarly, Dr. Carran, having given Schlegel an EEG, stated that the test revealed "interictal evidence that there are [partial] seizures," but acknowledged that Schlegel did not actually have a seizure during the recording.

Given this context, *Holzschuh v. UNUM Life Ins. Co.*, No. CIV. A. 02–1035, 2002 WL 1609983 (E.D.Pa. Jul.18, 2002) (Newcomer, J.) and *Cohen v. Standard Ins. Co.*, 155 F.Supp.2d 346 (E.D.Pa.2001) (Newcomer, J.), cited by plaintiff, are distinguishable and do not dictate a finding that LINA was arbitrary and capricious in this case. In *Holzschuh*, the district court, applying a heightened arbitrary and capricious standard, found that an administrator's termination of disability benefits previously paid to the plaintiff was arbitrary and capricious when (1) the "[p]laintiff's disability claim was supported by objective evidence such as MRI and CT reports, . . . doctors' observations, and x-rays," *id.* at *6, and yet (2) evidence was "dismissed" without being "confront[ed] squarely," *id.* at *6, (3) the administrator used "nurses and non-treating/examining physicians to

deny Plaintiff's claim after sustaining it for over a year," *id.* at *7, (4) "[d]espite the unwavering conclusions of Plaintiff's treating physicians, [the administrator's] nurses and reviewing doctors repeatedly referred only to those parts of Plaintiff's medical records that were adverse to Plaintiff's claim when justifying the denial of Plaintiff's claim," *id.* at *8, and (5) "acted more like an adversary than an impartial judge," *id.*, by offering "conclusory findings in the face of objective medical evidence and well reasoned opinions by Plaintiff's treating doctors." *Id.* These conditions do not obtain in this case.

First, the plaintiff in *Holzschuh* had presented the type of objective evidence of disability notably lacking in this case. The *Holzschuh* plaintiff, who suffered from severe cervical and lumbar pain, *id.* at *2, presented the administrator with numerous x-ray and imaging studies that revealed the structural reason for his complaints of pain and limitation. *See id.* at *3–*4. In this case, by contrast, Schlegel has offered one normal EEG, and one EEG that was "suspicious for epileptic form activity" and possibly contained "interictal evidence that there are seizures." No additional objective testing was completed before the record in this case was closed.

Second, it cannot be said that LINA dismissed evidence in this case without confronting it squarely, as had the plan administrator in *Holzschuh*. For example, Schlegel's strongest evidence pointing to disabling seizures or epilepsy is comprised of the one EEG documenting abnormal brain waves and Dr. Carran's conclusion, expressed in her strongly worded letter of February 13, 2002, that the EEG suggested that Schlegel indeed suffered from seizures and that "he is very clearly not able to work and function in the classroom setting." In direct response to Dr. Carran's submission, LINA engaged Dr. Loudis to

examine Schlegel's entire file. In follow-up, Dr. Loudis actually interviewed Dr. Carran, and then advised the administrator of the appropriate weight that, in her opinion, should be afforded to the EEG; Dr. Loudis wrote that, even in light of the EEG results, "objective documentation of occurrence of seizures has not been done" and went on to suggest that the EEG that had been performed by Dr. Carran did not establish that Schlegel suffered from epilepsy, as opposed to some other psychiatric disorder. The administrator weighted Dr. Carran's findings in accordance with Dr. Loudis' comments, and included in her report only those portions of Dr. Carran's letter that were supported by substantial evidence on the record, namely that Schlegel "has a history of likely complex partial seizures since 1983." Thus, the administrator in this case squarely confronted the evidence in the record.

■■■ Third, LINA's reliance on its own non-treating physicians over the opinions of Schlegel's treating physicians does not render its decision to deny Schlegel benefits arbitrary and capricious in this case. In the ERISA context, "plan administrators are not obliged to accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord,* —— U.S. ——, 123 S.Ct. 1965, 1967–68, 155 L.Ed.2d 1034 (2003). Although an administrator's reliance on non-treating sources may be "suspect" in some circumstances, *see, e.g., Holzschuh,* 2002 WL 1609983, at *7 (plan administrator relying on opinion of non-examining nurse); *Cohen v. Standard Ins. Co.,* 155 F.Supp.2d at 352 ("Defendant's physicians, one of whom is not even a cardiologist, based their opinions on cold test results contained in plaintiff's medical files, while plaintiff's treating physicians … concluded … based upon what they personally observed."), "[t]he decision to rely only upon a review of the

written submissions does not render the denial arbitrary" where the policy allows the administrator to do so. *Leonardo–Barone v. Fortis Benefits Ins. Co.*, No. 99CV6256, 2000 WL 33666891, at *13 (E.D.Pa. Dec.28, 2000) (Weiner, J.) (explaining that "[t]he decision to rely only upon a review of the written submissions does not render the denial arbitrary since by doing so [the administrator] violated no provision of the policy").

The policy at issue in this case identifies "evaluation of the Employee's ability to work by not more than three independent experts if required by the Insurance Company" as one consideration bearing on LINA's assessment of a claimant's ability to work, and further states that "[t]here is no cost to the Employee for evaluation by an independent expert when required by the Insurance Company ...." Thus, the LINA policy makes clear that independent medical examination of a claimant is not required, but rather may be ordered at the option of the insurance company. Therefore, in relying on its own non-treating physicians, LINA violated no policy provision, nor did it render a decision that was arbitrary and capricious on this basis.

The fourth and fifth concerns highlighted by the *Holzschuh* court are also not applicable in Schlegel's case. Here, the lack of objective medical evidence to support Schlegel's claim constitutes the basis for LINA's refusal to pay disability benefits. Therefore, LINA cannot be said to have selectively relied on Schlegel's medical records, or to have credited its own conclusory findings over objective medical evidence to the contrary. In light of all of the foregoing, the court finds that LINA's decision to deny disability benefits to Schlegel was neither arbitrary or capricious, and that summary judgment in LINA's favor is warranted on Count I of Schlegel's complaint.

## III. CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment will be denied. Defendants' motion for summary judgment will be granted as to Count I of the plaintiff's complaint. Defendants' motion for summary judgment will be denied without prejudice as to Count II of the plaintiff's complaint. Count III of the plaintiff's complaint is dismissed with prejudice.

An appropriate order follows.

### ORDER

**AND NOW**, this **9th** day of **June, 2003**, it is hereby **ORDERED** as follows:

1. Plaintiff's motion for partial summary judgment as to Counts I and III (doc. no. 13) is **DENIED**.

2. Defendants' motion for summary judgment (doc. no. 14) is **GRANTED** as to Count I.

3. Defendants' motion for summary judgment (doc. no. 4) with respect to Count II is **DENIED without prejudice** with leave to refile in accordance with the briefing schedule set forth in an order of even date.

4. Count III of the plaintiff's complaint is **DISMISSED with prejudice**.

5. Defendants' motion for leave to file attached reply brief (doc. no. 26) is **GRANTED**.

6. Defendants' motion in limine to preclude plaintiff's use of witnesses and evidence outside the ERISA administrative record (doc. no. 23) is **DENIED as moot**.

**AND IT IS SO ORDERED.**

### ORDER

**AND NOW**, this **9th** day of **June, 2003**, it is hereby **ORDERED** as follows:

1. Defendants shall file a motion for summary judgment with respect to Count II of the plaintiff's complaint by **June 19, 2003.**

2. Plaintiff shall file a response, if any, to defendants' motion for summary judgment by **June 30, 2003.**

3. Defendant shall file a response, if any, by **July 7, 2003.**

4. Oral argument on defendants' motion for summary judgment as to Count II of the plaintiff's complaint is **SCHEDULED** for **July 14, 2003** at **9:00 a.m.** in courtroom 3A, U.S. Courthouse, 601 Market Street, Philadelphia, Pennsylvania.

**AND IT IS SO ORDERED.**